UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                          :
MATTHEW SHIVELY,                                          :
                                                          :
                                    Plaintiff,            :          13 Civ. 2164 (PAE)
                      -v-                                 :
                                                          :          OPINION & ORDER
STEPHEN MITCHELL, THOMAS RUSCICA, and                    :
DESIGNLUSH, INC.                                          :
                                                          :
                                    Defendants.           :
                                                          :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

        Plaintiff Matthew Shively, a furniture designer, alleges that his sometime business

partners, Stephen Mitchell and Thomas Ruscica, fraudulently induced him to invest $1 million in

a non-existent corporation, Home Remodeling, Inc. (HRI), and then diverted his investment into

Designlush, Inc., a corporation they alone controlled.  In his Amended Complaint, Shively sues

Mitchell, Ruscica, and Designlush, Inc. on eight causes of action.  Defendants move to dismiss

three in their entirety—for fraudulent inducement, negligent misrepresentation, and mutual

mistake—and a fourth, conversion, in part.  Defendants acknowledge that Shively's other claims,

which sound in contract, state a claim.  For the reasons that follow, defendants' motion to

dismiss part of the conversion claim is granted.  However, the motion to dismiss the other three

causes of action is denied.

I.      **Background**

   A.  **Facts Alleged in the Amended Complaint**[1]

In 2008, Shively and his family lived on a large horse farm in Kentucky.  Am. Compl.

¶¶ 11, 14.  That year, he began to design and build high-end furniture and fixtures, working out

of a small shop with one full-time employee.  *Id.* ¶ 11.  Unlike most fledging furniture designers,

however, Shively had a large amount of money at his disposal.  *Id.* ¶ 14.

   In May 2010, Shively traveled to New York City to attend the International

Contemporary Furniture Fair.  *Id.* ¶ 12.  While in New York, Shively went to the New York

Design Center, a group of furniture showrooms, where he met Stephen Mitchell at Mitchell's

"Designlush" showroom.  *Id.*  Mitchell ran a furniture business using the name Designlush.  *Id.*

¶¶ 1, 12.  Mitchell expressed interest in Shively's work; the two stayed in touch over the next

few months.  *Id.* ¶ 12.

   On November 11, 2010, Shively traveled to New York to meet with Mitchell about

showing his designs under the Designlush brand.  *Id.* ¶ 13.  Around that time, Mitchell learned

that Shively "had access to a large amount of money."  *Id.* ¶ 14.  Shively revealed to Mitchell

that he lived on a large horse farm and stayed at expensive hotels in New York; later, in the

summer of 2011, Shively told Mitchell that he was considering purchasing and moving into an

expensive home in New York to facilitate his entry into the furniture design business.  *Id.*

---

[1] For the purpose of resolving the motion to dismiss, the Court assumes all facts pled in the
Amended Complaint ("Am. Compl.") (Dkt. 12) to be true, drawing all reasonable inferences in
favor of the plaintiff.  *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

The following abbreviations are used herein for the parties' memoranda of law:  (1) Defendants'
Motion to Dismiss the First Amended Complaint ("Def. Br.") (Dkt. 16); (2) Plaintiff's
Opposition to Defendants' Motion to Dismiss the First Amended Complaint ("Pl. Br.") (Dkt.
22); and (3) Defendants' Reply in Further Support of Motion to Dismiss the First Amended
Complaint ("Def. Reply Br.") (Dkt. 23).

Around November 2010, Mitchell and his life and business partner, Thomas Ruscica, *id.* ¶ 1, "put into motion their scheme to defraud Shively" by "taking advantage of Shively's desire to break into major markets with his designs." *Id.* ¶ 15.

In January 2011, Shively displayed his work at the Designlush booth at the annual Architectural Digest show. *Id.* ¶ 16. Mitchell charged Shively for his use of the space. *Id.* Around July 2011, Shively again displayed his work at a Designlush booth and paid for the space. *Id.* ¶ 17. In July 2011, Shively agreed to pay for cooperative advertising under the Designlush brand. *Id.* Shively alleges that, unbeknownst to him, these financial arrangements were contrary to standard industry practice. *Id.* ¶¶ 16–18.

On August 3, 2011, Mitchell and Ruscica took Shively and his wife to dinner "and discussed how they could be instrumental in helping Shively advance his career as a designer." *Id.* ¶ 21. On August 9, 2011, Mitchell proposed to Shively that he pay $2 to $5 million to obtain an equity interest in the corporation represented by Designlush. *Id.* ¶ 22. This investment would combine Mitchell and Ruscica's "established business model" with Shively's "equity partnered funding." *Id.* ¶ 23. The next day, Mitchell sent Shively an email expressing his excitement that the deal "could really springboard your career as a designer and DESIGNLUSH as [sic] company while providing us both a nice security blanket along the way." *Id.*

Shively alleges that this was not a bona fide investment opportunity, but rather an attempt to defraud him of his money by causing him to invest in a non-existent corporation, HRI, with the intent of then misusing and siphoning off his money. *Id.* ¶¶ 24, 45, 50.

On August 19 and August 21, 2011, Mitchell emailed Shively a series of spreadsheets purporting to provide financial information for Designlush. *Id.* ¶ 25. Shively alleges that these spreadsheets were intentionally misleading because there was no corporation named Designlush

at that time.  *Id.*  Shively further alleges that Mitchell and Ruscica constructed the spreadsheets for the sole purpose of defrauding him.  *Id.*

On September 21, 2011, Mitchell hosted a meeting to discuss the investment proposal at the office of his accountant, Martin Blank.  *Id.* ¶ 27.  Shively was joined at that meeting by his family's financial advisor, Will Ollinger, and attorney, Jack Bovay.  *Id.* ¶¶ 26–27.  Mitchell represented that Designlush was organized as a Wyoming corporation, HRI, doing business as Designlush.  *Id.* ¶ 27.  Mitchell proposed that Shively buy shares in HRI.  *Id.*

On October 11, 2011, Shively told Mitchell that he would not consider a multi-million dollar investment, but would consider investing $1 million.  *Id.* ¶ 29.  Shively alleges that Mitchell and Ruscica then "constructed a new set of knowingly false financial spreadsheets" purporting to be "financial projections for a non-existent corporation," HRI.  *Id.* ¶ 30.  Mitchell presented these spreadsheets to Shively.  *Id.*

On November 23, 2011, Mitchell and Ruscica's counsel presented Shively with the draft Shareholders' Agreement.  *Id.* ¶ 31.  Minor changes were then made to the agreement.  *Id.* ¶ 35.

In December 2011, Shively, Mitchell, and Ruscica signed the final Shareholders' Agreement.[2]  Shively Decl. Ex. A at 1 ("the Shareholders' Agreement" or "the Agreement").  The Agreement states that it is between Mitchell, Ruscica, and Shively, "representing owners of all issued stock of Home Remodeling, Inc., doing business as Designlush . . . and Home Remodeling, Inc., a corporation organized under the laws of the State of Wyoming and authorized to transact business within the State of New York, with offices for the transaction of business located at 200 Lexington Avenue, Suite 405, New York, New York 10016."  *Id.* at 1.

---

[2] The Agreement itself states that it was signed on December 12, 2011.  Shively Decl. Ex. A. at 1.  The Amended Complaint, however, states that the Agreement was signed on December 8, 2011.  Am. Compl. ¶ 35.

The Agreement recites as consideration "the premises and the mutual agreements contained in this agreement" and "the ongoing business and good will built up by the corporation and the $1,000,000 capital contribution to be made by Shively simultaneously with the execution of this agreement." *Id.* ¶ B. It states that Mitchell, Ruscica, and Shively are the sole shareholders of HRI, and designates 75 shares for Mitchell, 75 shares for Ruscica, and 50 shares for Shively. *Id.* ¶¶ B, 1.1. Mitchell is President and Treasurer, Ruscica is First Vice President and Secretary, and Shively is Second Vice President. *Id.* ¶ 2.1. Mitchell's salary is $150,000; he is in charge of "vendor development, product development, and product design." *Id.* ¶ 4.1. Ruscica earns $75,000 as the "creative consultant . . . in charge of marketing promotions and fashion industry liaison." *Id.* Shively earns $150,000 as "the Corporation's in-house fabricator [who] shall collaborate on custom designs and prototypes." *Id.* The Agreement requires unanimous consent of the shareholders before certain actions can be taken, such as issuing additional shares and incurring financial obligations greater than $10,000. *Id.* ¶ 2.5. The Agreement also contains provisions addressing indemnification, dividends, reports and records, restrictions on competitive activities, fringe benefits, confidential information, and the governing law (that of New York). *Id.* ¶¶ 2.6–4.6.

Unbeknownst to Shively, at the time of the negotiations and agreement, HRI did not exist as a corporation. It had once existed, but, on June 4, 2008, the Wyoming Secretary of State had administratively dissolved it, for failure to file a 2007 annual report. Shively Decl. Ex. B. The Amended Complaint alleges that Mitchell and Ruscica were aware of HRI's dissolution. Am. Compl. ¶ 24.[3]

---

[3] Defendants deny such awareness; they represent that they continued to file tax returns in the name of HRI in the belief that it was an extant corporation. Def. Br. 9 n.1; Def. Reply Br. 2 n.6.

After the parties signed the Agreement, Shively began work on a number of furniture and lighting pieces for the spring and summer trade shows.  Am. Compl. ¶ 45.  Between March and July 2012, his work was exhibited under the Designlush brand at multiple events and received critical acclaim.  *Id.* ¶¶ 42–44.

Shively alleges that, after receiving his $1 million investment, Mitchell and Ruscica began misappropriating it.  *Id.* ¶ 39.  They paid themselves the salaries provided for in the Agreement, but did not pay Shively until February 2012, after he repeatedly complained.  *Id.* Mitchell and Ruscica also paid their travel expenses out of the company's accounts, but Shively was not similarly reimbursed.  *Id.* ¶ 41.  Mitchell and Ruscica also used company assets "(i) to buy over $350,000 worth of inventory, (ii) to pay their personal car expenses of around $661 per month for a car they kept in Miami, (iii) to pay about $800 per month on a Citibank line of credit, (iv) to pay credit card bills for significant personal expenses, (v) to make payments on a loan where Ruscica was the borrower, and (vi) to throw a party with a cost … of around $10,000 at the Elle Décor show house in New York City without informing or consulting Shively."  *Id.* ¶ 50.  Meanwhile, Mitchell and Ruscica "put[] extreme pressure on Shively to provide even more capital, repeatedly telling him that the company would close without more money from him immediately."  *Id.* ¶ 51.

Around May 30, 2012, without telling Shively, Mitchell and Ruscica formed a corporation, Designlush, Inc., and transferred assets to it from HRI.  *Id.* ¶ 45.  "Mitchell and

---

On a motion to dismiss, however, the Court assumes the truth of the allegations in the Amended Complaint.  *Koch*, 699 F.3d at 145.

Ruscica were the only shareholders in the new corporation, which operated the Designlush Brand and held the majority of the assets formerly held under the HRI name." *Id.*[4]

In spring and summer of 2012, Shively began to suspect that Mitchell and Ruscica were taking advantage of him. *Id.* ¶ 46.  He noted that Mitchell was using HRI funds to pay other designers to produce pieces to be displayed under the Designlush brand and that Mitchell did not charge those designers for advertisements, floor space, or other expenses, even though Mitchell had charged Shively for those costs in 2011. *Id.*  Shively also observed that he was still required to pay his own productions costs. *Id.*

In July 2012, Shively moved from Kentucky to southern Connecticut. *Id.* ¶ 47.  Around that time, he learned that almost all of his $1 million investment in HRI had disappeared; he demanded further information about HRI and its finances. *Id.* ¶ 48.  He later demanded the return of his $1 million investment and of furniture and lighting he designed, which he states is valued at $114,000. *Id.* ¶¶ 56–57.  Defendants refused that demand. *Id.*  In September 2012, Mitchell stopped paying Shively his salary. *Id.* ¶ 39.

### B.  Procedural History

On April 2, 2013, Shively filed a Complaint against Mitchell, Ruscica, and Designlush, Inc.  Dkt. 1.  On May 17, 2013, defendants moved to dismiss.  Dkt. 8–10.  On June 7, 2013, Shively filed an Amended Complaint asserting causes of action for (1) fraudulent inducement, (2) negligent misrepresentation, (3) mutual mistake, (4) a declaratory judgment to the effect that the Shareholders' Agreement was immediately terminated at inception, (5) conversion, (6) breach of fiduciary duty, (7) breach of contract, and (8) unjust enrichment.  Dkt. 12.

---

[4] Mitchell and Ruscica assert that Shively is also a shareholder of Designlush, Inc., Def. Reply Br. 5 n.5, but this factual contention is not cognizable on their motion to dismiss.

On July 3, 2013, defendants moved to dismiss the first, second, third, and part of the fifth of these counts.  Dkt. 14–16.  Defendants argue that (1) Shively did not reasonably rely on defendants' allegedly fraudulent statements, (2) Shively failed to plead fraudulent inducement, negligent misrepresentation, and mutual mistake with the particularity required by Federal Rule of Procedure 9(b), and (3) conversion is an inappropriate remedy as to Shively's monetary investment because none of the funds at issue were segregated for a specific use or are specifically identifiable.

On July 25, 2013, Shively sought leave to cross-move for partial summary judgment on his claim for rescission of the Shareholders' Agreement due to mutual mistake.  Dkt. 18.  On July 30, 2013, defendants objected to that application.  Dkt. 19.  On August 1, 2013, the Court held that such a motion would be premature prior to the completion of fact discovery.  *Id.*

On August 22, 2013, Shively opposed the motion to dismiss.  Dkt. 21–22.  On September 4, 2013, defendants replied.  Dkt. 23–24.  On October 10, 2013, the Court held oral argument.

## II.    Applicable Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).  A complaint is properly dismissed, where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief."  *Twombly*, 550 U.S. at 558.  Accordingly, a district court must accept as true all well-pleaded factual allegations in the complaint, and draw all inferences in the plaintiff's favor.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)

8

("*ATSI*").  However, that tenet "is inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.  A pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard on claims alleging fraud or mistake.  "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).  To satisfy Rule 9(b), "a complaint must 'allege facts that give rise to a strong inference of fraudulent intent.'"  *Berman v. Morgan Keenan & Co.*, 455 F. App'x 92, 95 (2d Cir. 2012) (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).  Specifically, "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292–93 (2d Cir. 2006) (citation omitted).

## III.  Discussion

### A.    Fraudulent Inducement (Count One)

"To plead a claim for common-law fraudulent inducement, a plaintiff must assert the misrepresentation of a material fact, which was known by the defendant to be false and intended to be relied on when made, and that there was justifiable reliance and resulting injury."  *Braddock v. Braddock*, 871 N.Y.S.2d 68, 70 (1st Dep't 2009).[5]

---

[5] Here, both parties apply New York law in their submissions, and the Agreement provides that it is subject to New York law.  Shively Decl. Ex. A at ¶ 9.  The Court agrees that such law applies to all claims here:  Where "[t]he parties' briefs assume that New York law controls . . . such 'implied consent . . . is sufficient to establish choice of law.'" *Wolfson v. Bruno*, 844 F. Supp. 2d 348, 354 (S.D.N.Y. 2011) (quoting *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000)).

The Amended Complaint is fairly read to assert two theories of fraud.  One is simple: Mitchell and Ruscica represented to Shively that he was purchasing shares in HRI, whereas HRI did not exist, having been administratively dissolved.  Am. Compl. ¶¶ 2, 22, 24–25, 27, 30–36, 49.  The Court refers to this theory of fraud as the "HRI theory."  The second theory is more complex:  Mitchell and Ruscica represented to Shively that, in good faith, they intended to enter into a joint business venture with him that would also advance his career as a furniture designer, whereas in fact, they intended to take advantage of Shively and take his money.  *Id.* ¶¶ 21, 23, 24, 38; *see also id.* ¶¶ 12–20 (defendants took advantage of Shively's wealth and ignorance by charging him non-standard fees before the Shareholders' Agreement, and "used that knowledge to advance their scheme to defraud Shively of even greater amounts"); *id.* ¶¶ 21–25, 30 (describing defendants' presentation of the allegedly fraudulent business opportunity to Shively); *id.* ¶¶ 39, 45, 49 (describing misuse and shifting of funds).  The Court refers to this theory of fraud as the "joint venture theory."

Defendants argue that there are three deficiencies in the Amended Complaint's allegations of fraud:  (1) the Amended Complaint does not plead fraud with particularity as required by Rule 9(b); (2) the alleged misrepresentations were not material; and (3) Shively's reliance was not reasonable.[6]  The latter two objections suffer from a common defect:  They read the Amended Complaint too narrowly, focusing exclusively on the HRI theory and ignoring the alternative joint venture theory of fraud.

---

[6] Defendants also argue, with some force, that the financial projections they sent to Shively, Am. Compl. ¶¶ 25, 30, are not actionable in fraud, because they were forward-looking statements. However, neither the HRI theory of fraud nor the joint venture theory of fraud requires viewing these projections as actionable.

### 1. Particularity

Defendants argue that the Amended Complaint fails to plead fraud with the required particularity, because it does not specify "why or how any statements attributed to Defendants are claimed to have been false or fraudulent (and known to have been false or fraudulent when made)" and impermissibly relies on information and belief pleading.  Def. Br. 15, 17–18.

In fact, the HRI theory is pled with particularity.  The Amended Complaint alleges that Mitchell and Ruscica represented to him that he was purchasing shares in an existing corporation named HRI, Am. Compl. ¶¶ 27, 31 but in fact HRI did not then exist, *id.* ¶ 33, and Mitchell and Ruscica knew this, *id.* ¶ 24.  The Amended Complaint thus appropriately "specif[ies] the time, place, speaker, and content of the alleged misrepresentations," *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).  *See* Am. Compl. ¶ 27 (alleging that on September 21, 2011, at the office of Martin Blank, Mitchell represented to Shively that Designlush was organized as HRI); *id.* ¶ 31 (alleging that Mitchell and Ruscica instructed their counsel to represent to Shively in the draft Shareholders' Agreement that HRI was an extant corporation).

Defendants also object to Shively's reliance on information and belief pleading to allege that Mitchell and Ruscica were aware of HRI's dissolution.  *Id.* ¶¶ 24, 31.  *DiVittorio*, on which both parties rely, holds that "Rule 9(b) pleadings cannot be based upon information and belief," save that "fraud allegations may be so alleged as to facts peculiarly within the opposing party's knowledge, in which event the allegations must be accompanied by a statement of the facts upon which the belief is based."  822 F.2d at 1247.  Mitchell and Ruscica's knowledge regarding HRI falls under this exception, because their mental states were "peculiarly within [their] knowledge."  And although the Amended Complaint does not explicitly set out the basis for

11

Shively's belief that Mitchell and Ruscica knew that HRI had been dissolved, that basis is evident—they owned and operated HRI.  Any reasonable observer would expect them to know whether or not it had been dissolved.  The Court therefore "draw[s] [this] reasonable inference[] in the plaintiff's favor," *ATSI*, 493 F.3d at 98, and declines to fault the HRI theory based on its failure to specify, *in haec verba*, why HRI's owners knew of its dissolution.

The joint venture theory is also pled with sufficient particularity.  The Amended Complaint more than adequately alleges that Mitchell and Ruscica represented that they intended to enter into a legitimate business with Shively.[7]  The Amended Complaint specifies at least five instances of such explicit, or implicit but clear representations: (1) Mitchell's August 9, 2011 phone call proposing that Shively become an owner in the business represented by Designlush, Am. Compl. ¶ 22; (2) Mitchell's August 10, 2011 email expressing excitement that "with our established business model and your equity partnered funding this business could be limitless in it's [sic] potential" and "springboard your career as a designer," *id.* ¶ 23; (3) the spreadsheets that Mitchell sent Shively on August 19 and 21, 2011,[8] *id.* ¶ 25; (4) the spreadsheets that Mitchell sent Shively on October 12, 2011, *id.* ¶ 30; and (5) the draft Shareholders' Agreement that Mitchell and Ruscica's counsel presented to Shively on or about November 23, 2011, *id.* ¶ 31.

A much closer call is whether the Amended Complaint alleges facts that plausibly support the inference that, at the time Mitchell and Ruscica represented to Shively that they

---

[7] Although "intentionally-false statements . . . indicating [an] intent to perform under [a] contract [are] not sufficient to support a claim of fraud under New York law," *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996), the allegation here goes beyond a mere intention not to perform.  The Amended Complaint alleges that defendants intended to take his money and use it for their own personal gain, thereby looting the company.

[8] The Court does not consider the content of the forward-looking predictions in the spreadsheets as statements actionable in fraud.  *See supra* n.6.  Rather, the Court views the spreadsheets, as alleged, as a means of representing that the proposed investment was a legitimate business opportunity.

intended to enter into a legitimate business with him, they intended to defraud him of his money. Ultimately, however, the Court concludes that the Amended Complaint does allege sufficient facts to support an inference of fraudulent intent.

The Amended Complaint alleges three sets of facts that arguably reveal fraudulent intent. First, Mitchell took advantage of the fact that Shively was wealthy and ignorant, *id.* ¶¶ 12–15, 19, by charging him for booth space and advertising, contrary to industry practice, *id.* ¶¶ 15–18. But this does little to show Mitchell's intention to later loot Shively. Although it may not be standard industry practice to charge furniture designers for booth space and advertising, it is not illegal or even plainly unethical to do so. Mitchell's opportunism, or even greed, does not reveal a present intention to carry out a million-dollar fraud.

The second alleged fact—that Mitchell and Ruscica offered Shively shares in a dissolved corporation without disclosing its dissolution, *id.* ¶¶ 2, 22, 24–25, 27, 30–36, 49—is more substantial. At summary judgment or at trial, defendants may be able to demonstrate, as they claim, that they were ignorant of HRI's administrative dissolution. But at the pleading stage, with the Amended Complaint having alleged facts sufficient to support the inference that they were aware of its dissolution, the Court must take that inference as true. And, taken as true, it tends to support the presence of fraudulent intent.

Third, the Amended Complaint alleges that, after Shively invested the million dollars in early December 2011, Mitchell and Ruscica misappropriated the funds, in three ways. First, they paid themselves salaries without initially paying Shively. *Id.* ¶ 39. Second, they shifted assets from HRI to Designlush, Inc., which they created without Shively's knowledge and of which they were the only two shareholders. *Id.* ¶ 45. Third, they used HRI funds to pay their personal expenses. *Id.* ¶ 50. As to these allegations, had these acts of misappropriation occurred shortly

13

after the Agreement was signed, they would strongly suggest fraud at the inception. But they are alleged to have occurred months later, which significantly weakens such an inference. Of these acts, the salary malfeasance, as alleged, occurred earliest in time: The Amended Complaint alleges that Mitchell and Ruscica began paying themselves the salaries provided for in the Agreement "without delay," whereas Shively was not paid his salary until, it appears, February 2012,[9] three months after the parties signed the agreement, and after Shively had complained numerous times. *Id.* ¶ 39. The failure to pay Shively his salary, however, does not strongly evidence fraudulent intent. It could also reflect sloppiness or insensitivity as much as a deliberate refusal to pay Shively his just due while feigning a commitment to do so. The secret diversion of assets to Designlush, Inc., by contrast, is more suggestive of fraudulent intent. But it, as alleged, occurred around May 30, 2012, more than six months after the parties signed the Agreement. *Id.* ¶ 45. Finally, the Amended Complaint does not state specifically when Mitchell and Ruscica used the funds contributed by Shively for personal expenses, but a fair reading is that these expenditures occurred in spring or summer of 2012.[10] *Id.* ¶ 50.

Although the question is a close one, on balance, the Court finds that the Amended Complaint alleges facts sufficient to give rise to a plausible inference of fraudulent intent. The incidents of post-Agreement looting, occurring as they allegedly did some months after the Agreement was entered into, might alone be insufficient to give rise to that inference. But considering this looting alongside the allegation that Mitchell and Ruscica, at the time they were inducing Shively to enter into the Agreement, falsely represented that HRI was extant, the Court

---

[9] Or perhaps later—the Amended Complaint is not clear on this score. *See* Am. Compl. ¶ 39.

[10] The Court notes that the Amended Complaint includes, in its list of allegedly personal expenses, "$350,000 worth of inventory." *See* ¶ 50. But the Amended Complaint does not allege facts to suggest that such inventory was other than a legitimate business expense.

concludes that the Amended Complaint alleges sufficient facts to support an inference of fraudulent intent.

### 2.  Materiality

Defendants next argue that the alleged misrepresentations were not material.[11]  However, defendants do not address themselves to the joint venture theory of fraud.  And, as alleged in the Amended Complaint, Mitchell and Ruscica's representation that the proposed business opportunity was bona fide, rather than fraudulent, was material:  Had they instead told Shively that they intended to divert his money to pay their personal expenses, he assuredly would not have contributed $1 million to them.  The Amended Complaint fairly alleges materiality.

### 3.  Reasonable Reliance

In their final challenge to the fraudulent inducement count, defendants argue that it was unreasonable for Shively to rely on their allegedly false representation that HRI was extant, because "the most basic due diligence"—to wit, a check of the Wyoming Secretary of State's website—would have revealed that HRI had been administratively dissolved.  Def. Br. 11–15. But, on a motion to dismiss, defendants can prevail only if it was categorically unreasonable for Shively to rely on this representation.  Defendants cite no authority for the proposition that it is *per se* unreasonable for a party to a proposed transaction such as the one embodied in the Agreement not to consult the website of the Secretary of State before entering into it.  The Court declines to adopt such a rule.  The Amended Complaint fairly pleads reasonable reliance with respect to the HRI theory of fraud.  Defendants are at liberty, in discovery, to seek to establish facts that demonstrate that such reliance was unreasonable.

---

[11] Defendants' materiality arguments are framed in the context of Shively's claim of mutual mistake, but they are also relevant to Shively's claims of fraud and negligent misrepresentation.

The joint venture theory of fraud theory again survives untouched.  Defendants have not argued that it was unreasonable for Shively to rely on the defendants' implicit representation that theirs was a bona fide business venture.  On the facts pled, it is plausible to claim that such reliance was reasonable.

The Court, therefore, denies defendants' motion to dismiss the fraudulent inducement count.  The Amended Complaint has stated such a claim.

## B.      Negligent Misrepresentation (Count Two)

"To state a claim for negligent misrepresentation under New York law, the plaintiff must allege that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment."  *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 114 (2d Cir. 2012) (citation omitted).  The misrepresentation must relate to an "existing material fact."  *Capricorn Investors III, L.P. v. Coolbrands Int'l, Inc.*, 886 N.Y.S.2d 158, 159 (1st Dep't 2009).

The Amended Complaint's theory of negligent misrepresentation is that if Mitchell and Ruscica did not know that their representation that HRI's was an existing corporation was false, their representations to that effect were at least negligent.  Am. Compl. ¶ 71.[12]  In their motion to dismiss, defendants challenged this theory on two grounds: that the Amended Complaint does not plead negligent misrepresentation with particularity, and that Shively's reliance was not reasonable.  But these arguments fail for the reasons discussed above.  *See supra*, Section III.A.

---

[12] This alternative pleading relates, of course, only to the HRI theory of fraud, not to the joint venture theory.

At argument, defendants raised a different objection.  They argued that Shively was not injured by their representations regarding HRI, because, whether the corporate vehicle known as HRI existed or not, Shively still intended to invest in their ongoing business, Designlush.  The Amended Complaint, however, alleges that Shively invested $1 million so as to obtain an equity stake in HRI, and that he was given no such stake.  Am. Compl. ¶ 34.  It is entirely possible that, in discovery, defendants will show that the legal status of HRI was immaterial to Shively, because Shively's interest was in obtaining an equity stake in the underlying business, not in the particular vehicle known as HRI.  But on the pleadings, the Court cannot so conclude.  Quite the contrary, the Amended Complaint alleges that, in exchange for his $1 million investment, Shively received nothing—neither an equity stake in HRI nor in any other concern.

The Amended Complaint, therefore, alleges facts sufficient to show that Mitchell and Ruscica's statements regarding HRI were material to Shively and that he relied on them, to his detriment.  Defendants' motion to dismiss the claim of negligent misrepresentation is denied.

### C.    Mutual Mistake (Count Three)

"For a party to be entitled to reformation of a contract on the ground of mutual mistake, the mutual mistake must be material, *i.e.*, it must involve a fundamental assumption of the contract.  A party need not establish that the parties entered into the contract because of the mutual mistake, only that the material mistake . . . vitally affects a fact or facts on the basis of which the parties contracted." *Asset Mgmt. & Capital Co., Inc. v. Nugent*, 925 N.Y.S.2d 653, 654 (2d Dep't 2011) (citation omitted).  "Proof of mutual mistake must be of the highest order, and must show clearly and beyond doubt that there has been a mutual mistake and must show with equal clarity and certainty the *exact and precise* form and import that the instrument ought

17

to be made to assume, in order that it may express and effectuate what was really intended by the parties." *Id.* (citation omitted) (emphases in original).

The Amended Complaint principally alleges that the parties were mutually mistaken about whether HRI, in which Shively invested $1 million, existed. Am. Compl. ¶¶ 80–81, 84.[13] Defendants' main argument in response is that the Amended Complaint does not plead mutual mistake with particularity. But as explained earlier, *see supra* Section III.A.1, the Amended Complaint is instead quite particular in pleading the HRI theory with respect to fraud. The same is so as to its allegation of mutual mistake.

At oral argument, defendants made a different argument. They urged that any mistake as to HRI's existence was not material. Although defendants may be able to establish this point at summary judgment or at trial, the Court cannot so rule on the pleadings. *See supra* Section III.A.2. The Amended Complaint states a claim for mutual mistake.

That said, it is not a foregone conclusion that Shively, were he to prove such a mutual mistake, would be entitled to rescission, the remedy he appears to prefer. To merit this remedy, Shively would need to establish that it was material to him, at the time of his investment, that the investment be specifically in HRI, doing business as Designlush, as opposed to in a substantively identical business not bearing the HRI name; or that disclosure of HRI's actual corporate status would have led him not to invest at all, even in a substantively identical but extant entity. Absent such a showing, defendants may fairly argue, the remedy for a finding of mutual mistake is

---

[13] The Amended Complaint also asserts mutual mistake based on the accuracy of the financial projections provided by Mitchell and Ruscica and on the references to New York law in the contract. These theories, however, do not allege a viable theory of mutual mistake. Defendants' financial projections were not of facts "exist[ing] at the time the contract is entered." *Republic of Rwanda v. Ferone*, 307 F. App'x 600, 601 (2d Cir. 2009). Nor are the alleged shortcomings in the HRI agreement with respect to applicable law mistakes as to existing facts. The Agreement's prose in this section is garbled, but Shively fails to explain why the muddled text to which he points reflects a mutual mistake of fact.

properly contractual reformation, so as to correct this mistake and effectuate the parties' shared intent as to Shively's investment.

### D.    Conversion (Count Five)

Finally, defendants move to dismiss the conversion claim.  "Conversion is the 'unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.'"  *Brown v. Kay*, 889 F. Supp. 2d 468, 486 (S.D.N.Y. 2012), *aff'd*, 514 F. App'x 58 (2d Cir. 2013) (quoting *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403–04 (2d Cir. 2006)).  "To maintain a claim for conversion, a plaintiff must show 'legal ownership of a specific identifiable piece of property and the defendant's exercise of dominion over or interference with the property in defiance of the plaintiff's rights.'"  *Regions Bank v. Wieder & Mastroianni, P.C.*, 526 F. Supp. 2d 411, 413 (S.D.N.Y. 2007), *aff'd*, 268 F. App'x 17 (2d Cir. 2008) (quoting *Ahles v. Aztec Enters., Inc.*, 502 N.Y.S.2d 821, 822 (3d Dep't 1986)).

The Amended Complaint alleges conversion based on defendants' retention and misuse of Shively's $1 million dollars and their retention of $114,000 worth of furniture and lighting pieces designed by him (the "Shively Design Work").  Am. Compl. ¶¶ 56–57, 96–99.  It asserts that Shively is the sole owner of that property and that defendants have no right to possess it, "especially since the HRI Agreement is void or terminated."  *Id.* ¶¶ 96–97.

Defendants do not move to dismiss Shively's conversion claim as it relates to the Shively Design Work.  Def. Br. 2.  Rather, they represent that they will later seek to defend this claim on the facts.  *Id.* at 22.

As to the $1 million, defendants argue that because the money was not kept in a "specifically identifiable, segregated" account, it is not subject to a claim for conversion.  Def.

Br. 22 (quoting *High View Fund, L.P. v. Hall*, 27 F. Supp. 2d 420, 429 (S.D.N.Y. 1998)).  In

*High View*, plaintiffs alleged that they had invested $1 million in United Golf, a business that

purported to invest in golf properties, for which they received shares of common stock and

Notes.  27 F. Supp. 2d at 422–423.  The defendants, a Mr. Hall (the company's chairman and

CEO) and Mrs. Hall (a board member), used company funds for personal expenses.  *Id.* at 424.

A year later, United Golf became insolvent, Mrs. Hall stepped down from the board, and Mr.

Hall was removed.  *Id.* at 423–424.  The company did not engage in any business activities

afterwards, and it was revealed that it had never acquired any golf courses.  *Id.*  Plaintiffs brought

claims for fraud and conversion.  *Id.* at 422.  The conversion claim sought return of the $1

million that plaintiffs had invested in United Golf.  *Id.* at 429.  The district court, however,

dismissed the conversion claim because "plaintiffs [did] not claim ownership of a 'specifically

identifiable, segregated [$1 million].'"  *Id.* (quoting *Manufacturers Hanover Trust Co. v. Chem.

Bank*, 559 N.Y.S.2d 704, 712 (1st Dep't 1990)).

　　　　Defendants argue that this logic controls here.  Shively counters that "a specific,

identifiable fund" that is meant to be "treat[ed] in a particular manner" can be the subject of a

conversion action if not so treated.  Pl. Br. 19 (quoting *Jones v. Dana*, No. 06 Civ. 0159 (RPP),

2006 WL 1153358, at *29 (S.D.N.Y. May 2, 2006)).  He is correct that a conversion action may

lie where funds are diverted entirely for an unauthorized purpose.  In *Jones*, for example, a

conversion claim was viable where defendant had "lied to Plaintiff about the investment of

Plaintiff's funds, which were never used to purchase any stocks, bonds, partnership interest, or

other investment on Plaintiff's behalf, but were instead diverted by [defendant] through a series

of account transfers to fund her own investments and her own support and extravagant lifestyle."

2006 WL 1153358, at *8.  Similarly, in *Hoffman v. Unterberg*, plaintiff stated a conversion claim

by alleging that defendants, to whom he had "loaned a portion of his distributions for a specific

purpose," used the money "for an unauthorized purpose and . . . refused to return the money

upon his demand."  780 N.Y.S.2d 617, 619 (2d Dep't 2004), *abrogated on other grounds by*

*Tzolis v. Wolff*, 10 N.Y.3d 100 (2008).  This, however, does not mean that whenever *any* portion

of an account is used for an unauthorized purpose, an action for conversion will lie.

     The allegations in the Amended Complaint are akin to those in *High View*, not those in

*Jones* or *Hoffman*.  In *High View*, conversion was held inappropriate because plaintiffs had made

an investment, and some of that money had been misused.  In *Jones* and *Hoffman*, by contrast, a

conversion claim was viable where an entire fund had been misappropriated.  Here, the Amended

Complaint alleges, Shively made an investment, part of which was misappropriated.  However,

the Amended Complaint does not allege that the entire amount, $1 million, was stolen.  On the

contrary, the Amended Complaint avers that a portion of Shively's investment was used to pay

him a salary, and another portion was used to purchase "over $350,000 worth of inventory,"

which, absent contrary pleadings, must be taken as a bona fide business expense.  *See* Am.

Compl. ¶¶ 39, 50.  Even if the majority of Shively's investment was misappropriated, such facts

would not support a claim for conversion.

     Shively's claim for conversion, to the extent based on a claim of conversion of his entire

$1 million investment, is, therefore dismissed.

## CONCLUSION

     For the reasons stated above, defendants' motion to dismiss is granted solely as to the

portion of the claim in Count Five for conversion that relates to Shively's $1 million investment.

The balance of the conversion claim, alleging conversion of the Shively Design Work, remains.

Defendants' motion to dismiss is denied as to the other three causes of action which defendants

have sought to dismiss.  The Clerk of Court is respectfully directed to terminate the motion at docket number 14.

At argument, the Court ordered that fact discovery would close on February 10, 2014 and that the next conference with the Court would be held on March 14, 2014.  Pursuant to the Court's Individual Rules, if a party wishes to move for summary judgment it must, by February 24, 2014, submit a letter not to exceed three pages in length, setting forth the basis for the anticipated motion, including the legal standards governing the claims at issue.  The other party shall respond similarly by February 27, 2014.

The parties have not yet completed a Civil Case Management Plan.  The Court directs them to meet and confer and to complete such a plan, consistent with the above deadlines, by November 7, 2013.  A template is available on the Court's website.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: October 24, 2013
       New York, New York